# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ROBERT A. CATALFAMO, individually and on behalf of the Sears Holdings Savings Plan, and/or on behalf of a class consisting of similarly situated participants of the Sears Holdings Savings Plan,<br><br>Plaintiff,<br><br>v.<br><br>SEARS HOLDINGS CORPORATION, EDWARD S. LAMPERT, SEARS HOLDINGS CORPORATION INVESTMENT COMMITTEE, and JOHN DOES 1-20,<br><br>Defendants. | Case No. 1:17-cv-5230<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## Nature of the Action

1. Plaintiff Robert A. Catalfamo ("Plaintiff"), individually, and on behalf of the Sears Holdings Savings Plan (the "Plan"), and as representative of the class described herein, brings this action against the above-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.

2. Sears Holdings Corporation ("Sears" or the "Company") has not had a profitable year since 2011, and has not had a profitable quarter from business operations since 2010. Ignoring the non-recurring revenue from cannibalizing itself that has caused Sears's only "profitable" quarters in recent years (*see infra* nn.1-3), Sears has a net loss attributable to shareholders of a staggering $10.196 billion since year-end 2010.

| Net Income (Loss) Attributable to Shareholders (in millions) | Q1 | Q2 | Q3 | Q4 | Total: |
|---|---|---|---|---|---|
| 2017 | $244[1] | | | | 244.00 |
| 2016 | ($471) | ($395) | ($748) | ($607) | ($2,221) |
| 2015 | ($303) | $208[2] | ($454) | ($580) | ($1,129) |
| 2014 | ($402) | ($573) | ($548) | ($159) | ($1,682) |
| 2013 | ($279) | ($194) | ($534) | ($358) | ($1,365) |
| 2012 | $189[3] | ($132) | ($498) | ($489) | ($930) |
| 2011 | ($165) | ($152) | ($410) | ($2,386) | ($3,113) |
| | | | | **TOTAL:** | ($10,196) |

3.      Drowning in insurmountable debt for years and with its main source of income –

retail – suffering as a result of its failure to keep up with the competition and move towards online

sales, Sears faces inevitable bankruptcy.  Comparable "same-store sales", a metric that strips out

the impact of newly closed or open stores, have continued to relentlessly fall, and Sears is

hemorrhaging assets while showing no reasonable hope for future profits other than divesting the

few assets it has left.

4.      Defendants, including Sears, breached the duties they owed to the Plan, to Plaintiff,

and to the putative class members who are also Plan participants and beneficiaries ("Participants")

by, *inter alia*, retaining Sears common stock, which traded on the New York Stock Exchange

("NYSE") under the ticker "SHLD" ( "Sears Stock" or "Company Stock"), as an investment option

---

[1] Includes one-time proceeds from Craftsman Sale of $572 million which will deplete Sears's future revenue.  Absent that sale, Sears's losses would have been $328 million.

[2] In the second quarter of 2015, Sears recorded an immediate net gain of $508 million related to the Seritage and JVs transactions, which related to real estate sales and sale-leaseback transactions.

[3] According to a Form 10-Q filed with the Securities and Exchange Commission ("SEC"), Sears recorded quarterly gains on sales of assets of $395 million, compared with $2 million year-over-year.  "The gains recorded during the first quarter of 2012 included . . .  $223 million recognized on the sale of eleven (6 owned and 5 leased) Sears Full-line store locations to General Growth Properties for $270 million in cash proceeds, and a gain of $163 million recognized on the surrender and early termination of the leases on three properties operated by Sears Canada. . . . ."

in the Plan (the "Company Stock Fund," "Holdings Stock Fund" or "Fund") when a reasonable fiduciary using the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

5.      This case is about the Defendants' abject failure, as Plan fiduciaries, to protect the interests of the Participants in violation of Defendants' legal obligations under ERISA, including ignoring the excessive risk imposed on Participants by the rise in the debt-equity ratio of Sears,[4] and other objective factors that imposed risks to the Fund by Defendants' actions and inactions.

6.      In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014) ("*Fifth Third*"), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent plan investment option. The Supreme Court held that retirement plan fiduciaries are required by ERISA to independently determine whether company stock remains a prudent investment option. In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence" standard. *Fifth Third*, 134 S. Ct. at 2463. The Supreme Court rejected that argument, holding that "no such

---

[4] According to www.ycharts.com/companies/SHLD/debt_equity_ratio, the Company's debt-to-equity ratio has been as follows (at times, debt-to-equity ratio is negative because Sears's shareholder base has *negative total equity*):

| Net Income (Loss) Attributable to Shareholders (in millions) | Jan. 31 | Apr. 30 | July 31 | Oct. 31 |
|---|---|---|---|---|
| 2017 | -1.089 | -1.214 | | |
| 2016 | -1.516 | -1.588 | -1.316 | -1.272 |
| 2015 | -3.971 | -3.273 | -3.447 | -2.216 |
| 2014 | 2.443 | 3.925 | 8.406 | 41.14 |
| 2013 | 1.132 | 1.491 | 1.586 | 2.505 |
| 2012 | 0.8159 | 0.7153 | 0.7437 | 1.042 |
| 2011 | 0.3752 | 0.4378 | 0.4514 | 0.5964 |

presumption applies," *id.*, and further held "that the duty of prudence **trumps** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468 (citation omitted) (emphasis added).[5] Accordingly, here, the Plan's "fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general." *Id.* at 2463.

7. *Fifth Third* did not alter the traditional type of imprudence claim that Plaintiff brings – that the employer's stock has become an imprudent investment not because it is overpriced, but because adverse changes in the company's basic risk profile, *i.e.*, its circumstances have made the stock too risky an investment given the character and aim of the plan as a vehicle for retirement savings. This type of claim is firmly entrenched in basic trust law principles from which ERISA is derived.

8. The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). *Tibble* held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.[6]

---

[5] Emphasis throughout this Complaint is added unless otherwise noted.

[6] *Tibble* cites with approval to the Uniform Prudent Investor Act (1994) which enshrines trust law and recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ." 135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

9.      Thus, simply stated, even if the Plan purportedly required that Sears Stock be offered, the Plan's fiduciaries were obligated by law to disregard that directive once it became clear Company Stock was no longer a prudent investment for the Plan.

10.     The thrust of Plaintiff's allegations under Counts I (breach of ERISA's duty of prudence) and II (breach of ERISA's duty of loyalty) is that Defendants allowed the investment of the Plan's assets in Sears Stock throughout the Class Period (July 14, 2014 to the present) even after Defendants knew or should have known, through massive amounts of publicly available information, that Sears was in extremely poor financial condition and faced equally poor prospects indicating that it had experienced a sea-change in its risk profile and its prospects, making it an imprudent retirement plan investment vehicle.  In short, Sears was patently unable to service its tremendous debt load, was hemorrhaging precious liquidity, and absent a significant and unpredicted change in retail trends, or significant and unforeseen strategic transactions,[7] Sears would be forced into bankruptcy.

11.     Defendants were empowered and obliged by ERISA to remove Sears Stock from the Plan, yet they failed to do so, or to act in any way to protect the interests of the Plan or its Participants, until it was too late to make any material difference, in violation of ERISA.

12.     Indeed, Sears Stock was an imprudent investment for the Plan for many reasons. Principally, during the Class Period, *inter alia*: (a) drastic changes in the retail industry which Sears failed to adapt to compromised Sears's financial health, and regularly forced Sears to divest its most valuable assets in order to pay operating and interest expenses so that it could continue losing money; (b) Sears's deteriorating Altman Z-score ("Z-score") – a formula commonly used

---

[7] Given Sears's condition, it is unlikely any such transaction would be favorable to shareholders.

by financial professionals to predict a company's likelihood of bankruptcy – indicated that Sears was in danger of bankruptcy;[8] (c) Sears's debt to equity ratio increased excessively, and; (d) secular shifts in the retail industry rendered Sears highly unlikely to survive in the near-term or long-term.

13.     Leading up to the start of the Class Period, the retail industry underwent massive disruption.  It was, and should have been or become, obvious to Defendants that Sears was not positioned to compete or profit.  Yet, despite predictions that the retail industry was facing a sea-change, Defendants allowed Participants to gamble their retirement savings on faith and hope: Sears Stock's was unduly risky for Participants' retirement savings.

---

[8] The Z-Score, a commonly accepted bankruptcy prediction model, was developed in 1968 by Professor Edward Altman of the School of Commerce, Accounts and Finance, which is now known as the Leonard N. Stern School of Business, at New York University.  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding a federal agency's use of Altman Z-Score analysis for predicting likelihood of bankruptcy and accepting that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).  A Z-Score above 2.99 is the "safe zone" where a company is unlikely to go bankrupt, a score from 1.88 to 2.99 is the "grey zone," and a score less than 1.88 is the "distress zone" with a high probability a company will go bankrupt within two years.

During the Class Period, there was additional objective evidence of the Company's precarious financial condition as its Z-Score indicated it faced a substantial risk of bankruptcy. According to data available from gurufocus.com, the Company's Z-scores were as follows:

|            | Z-score | Zone          |
|------------|---------|---------------|
| 1/15/2015  | 1.9600  | Grey Zone     |
| 4/15/2015  | 1.8200  | Distress Zone |
| 7/15/2015  | 1.9800  | Grey Zone     |
| 10/15/2015 | 1.7500  | Distress Zone |
| 1/16/2016  | 1.6500  | Distress Zone |
| 4/16/2016  | 1.6100  | Distress Zone |
| 7/16/2016  | 1.3700  | Distress Zone |
| 10/16/2016 | 1.0300  | Distress Zone |
| 1/17/2017  | 0.9100  | Distress Zone |
| 4/17/2017  | 1.0900  | Distress Zone |

14.     When enforcing ERISA's duties of prudence and loyalty, courts focus not only on a transaction's merits, but also on the thoroughness of the investigation into a transaction's merits. A pure heart and an empty head is no defense to breaches of ERISA's fiduciary duties.  In failing to investigate, analyze, and review whether it was prudent to continue investment in Sears Stock in the Plan, Defendants acted procedurally imprudently.  Had Defendants conducted a prudent evaluation of whether Sears Stock was an appropriate investment for the Plan during the Class Period, and taken appropriate Plan-protective action based upon what they would have discovered – such as ceasing the offering of Sears Stock, divesting the Plan of Sears Stock, or any of the other actions as described below – the Participants would not have suffered such devastating losses to their retirement savings.  Freezing purchases of the Fund at year end 2016 was too little, too late, to protect a great deal of Participants' retirement savings.

15.     Plaintiff further alternatively alleges, pursuant to FED. R. CIV. P. 8(d)(2), that each of the following, individually, represents the kind of "special circumstances" rendering reliance on Sears Stock's price imprudent and supporting a finding of violations of ERISA: (a) Sears's serious deteriorating condition, evidenced by an exceptional amount of negative publicly available information, coupled with the state of the retail industry and Sears's inability to profit on same store sales, which was ignored or downplayed by the Plan's fiduciaries in continuing to offer the Fund; (b) Sears's overwhelming debt was unserviceable based upon its prospects; and (c) Defendants' failure to employ a reasoned decision making process in monitoring and evaluating the Fund; each, individually, represents the kind of "special circumstances" that the

Supreme Court recognized in *Fifth Third* rendered reliance on Sears Stock's price imprudent and supports a finding of breach of ERISA's fiduciary duties.[9]

16.     Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could loyally have made the same decision as Defendants did here to retain and/or continue purchasing the clearly imprudent Sears Stock as a Plan investment. To remedy the breaches of fiduciary duties as described herein, Plaintiff seeks to recover the damages suffered by the Plan as a result of the diminution in value of Company Stock invested in the Plan.

17.     In an ERISA case such as this, the proper measure of damages is the difference between what benefits the Plan Participants received and what the Plan Participants would have received if the Plan's assets had been invested prudently. In other words, with respect to the calculation of the losses to a plan, but for the breaches of fiduciary duty, the participants in the plan would not have made or maintained investments in the challenged investment and, where alternative investments were available, the investments made or maintained in the challenged investment would presumably have instead been made in the most profitable alternative investment available. In this way, the remedy restores the value of the plan's assets to what it would have been if the plan had been properly administered.

18.     During the Class Period, the Plan and its Participants suffered tens of millions of dollars of losses and, as noted above, damages likely exceed losses here.

---

[9] This type of special circumstance was specifically recognized by the author of *Fifth Third*, Justice Breyer during oral argument of *Fifth Third*. *See Fifth Third* Oral Argument Transcript at 31:10-18 (describing hypothetical situation where in a fiduciary's "inbox is ten feet of papers telling him about… the corporation's condition. It's apparent he's never read them. If he had read them, he would have taken action. Of course you would have a case, I would think."). *Available at* http://www.supremecourt.gov/oral_arguments/argument_transcript/2013.

19.     Given the totality of circumstances prevailing, no prudent fiduciary would have made the decision to retain Sears Stock as a Plan investment option during the Class Period.

## Jurisdiction and Venue

20.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

21.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

22.     ***Venue.***  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered, some or all of the fiduciary breaches for which relief is sought occurred, and one or more Defendants reside or may be found in this district.

## Parties

### Plaintiff

23.     Plaintiff Robert A. Catalfamo is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of Sears Stock in his Plan account during the Class Period.  During the Class Period, the value of shares in Sears Stock within Plaintiff's Plan accounts diminished considerably as a result of Defendants' breaches of fiduciary duty as described herein.

24.     Plaintiff is no different than thousands of other Participants who trusted the Defendant-fiduciaries to fulfill their ERISA-mandated fiduciary duties with respect to the Plan.

### Defendants

(a)     **The Company**

25.     Defendant Sears Holdings Corporation, a Delaware Corporation with its principal place of business 3333 Beverly Road in Hoffman Estates, Illinois 60179-0001, is the Plan Sponsor.

9

*See* Sears Holdings Savings Plan Annual Report for Year-Ended December 31, 2015 filed with the SEC on June 28, 2016, at 7 (the "2015 Form 11-K"). As the 2015 Form 11-K states, members of both Plan committees are employees of Sears.

26. Sears also was a fiduciary of the Plan during the whole of the Class Period. Sears breached its fiduciary and co-fiduciary duties as described herein.

27. Sears, acting through its CEO (as discussed below), appointed the persons who managed and administered the Plan. Sears is legally responsible for the fiduciary breaches of its employees, as alleged herein. Instead of delegating fiduciary duties for the Plan to outside service providers, Sears chose to internalize the Plan's fiduciary functions and, upon information and belief, appointed its employees as Plan fiduciaries.

   **(b)**    **The CEO Defendant**

28. Defendant Edward S. Lampert has served as Sears's Chairman of the Board and Chief Executive officer ("CEO") since prior to the start of the Class Period, and has been a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

29. According to the section of the Sears Holdings Benefits Handbook 2015 for Salaried and Full-Time Hourly Employees discussing the Plan (the "2015 Handbook"), members of the Committee (defined below) are appointed by the CEO of Sears.

30. Defendants Lampert and Sears are referred to herein collectively as the "Monitoring Defendants."

(c)    **Committee Defendants**

31.    Defendant Sears Holdings Corporation Investment Committee (the "Committee") was a Plan fiduciary at all times relevant hereto. The 2015 Handbook states that "[t]he [Committee] selects the investment funds offered under the Savings Plan, based on the recommendation of the investment advisor to the Savings Plan and Master Trust ("Advisor")" and that "[t]he available investment fund options are subject to change or elimination by the [Committee] at any time without prior notice." The 2015 Handbook further states that "[t]he [Committee], as a fiduciary, and Towers Watson Investment Consulting, the Advisor to the [Committee], are responsible for selecting and monitoring the investment performance of the Savings Plan investment funds. . . . Each investment fund, except for the Self-Directed Brokerage Account, is managed by a professional investment manager appointed by the [Committee] at the recommendation of the Advisor."

32.    During the Class Period, the Committee and its members (each of whom was an employee of Sears) were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

33.    Per Sears's Form 10-K Annual Report filed with the SEC on March 21, 2017:

> The [Committee] is responsible for the investment of the assets of Holdings' domestic pension plans. The [Committee], made up primarily of select members of senior management, has appointed a non-affiliated third party professional to advise the [Committee] with respect to the assets of Holdings' domestic pension plans. The plans' overall investment objective is to provide a long-term return that, along with Company contributions, is expected to meet future benefit payment requirements. A long-term horizon has been adopted in establishing investment policy such that the likelihood and duration of investment losses are carefully weighed against the long-term potential for appreciation of assets.

**(d)     "John Doe" Defendants**

34.     The John Doe Defendants are Company officers, directors, and employees who were fiduciaries of the Plan during the Class Period, including members of the Committee or other persons or committees who served as fiduciaries with respect to the selection of the Plan's investment options.  The identities of the John Doe Defendants are currently unknown to Plaintiff, and Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-20 include other individuals, including, but not limited to, Company officers, directors, and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## The Plan

### The Plan's Purpose

35.     The Plan is a retirement savings plan.  As noted above in ¶ 33, "[t]he plans' overall investment objective is to provide a long-term return that, along with Company contributions, is expected to meet future benefit payment requirements. A long-term horizon has been adopted in establishing investment policy such that the likelihood and duration of investment losses are carefully weighed against the long-term potential for appreciation of assets."  The 2015 Handbook echoes that the "Plan provides [Participants] with an easy and effective way to build savings for your retirement" and repeatedly refers to Plan assets as Participants' "retirement savings."

### The Plan's Operations

36.     In a defined contribution plan, like the Plan, individual accounts are set up for participants.  Benefits are based on the amounts contributed by employees and their employer.  Benefits are the amount of money credited to the account, plus any investment earnings made or

losses suffered, on the assets in each account. Investment gains or losses are a function of the allocation of contributions among the limited investment options offered by the plan's fiduciaries.

37.     The 2015 Form 11-K sets forth the following description of the Plan:

> ***History and Purpose*** - Sears, Roebuck and Co. ("Sears") established a predecessor plan to the Sears Holdings Savings Plan (the "Plan") by the execution and adoption of a plan document (the "Plan Document"), dated July 1, 1916. The Plan Document has been amended and restated from time to time. The Plan was fully amended and restated as of January 1, 2014, but has been amended from time to time thereafter. The following description of the Plan provides only general information. Participants should refer to the Plan Document for complete information.
>
> Prior to January 1, 2005, employees of Sears, Roebuck de Puerto Rico, Inc. participated in the Plan. Effective January 1, 2005, Sears established the Sears Puerto Rico Savings Plan and Plan assets attributable to those participants were transferred to the Sears Puerto Rico Savings Plan in February 2005.
>
> In March 2005, Sears merged with Kmart Holding Corporation and became a wholly owned subsidiary of Sears Holdings Corporation (the "Company"). Sears continued to sponsor the Plan through March 31, 2012.
>
> At the close of business March 31, 2006, the Kmart Retirement Savings Plan (the "Kmart Plan") was merged with and into the Plan. At that time, Kmart Plan assets, including participant loans, were transferred to either this Plan or, with respect to Kmart Plan participants who resided in the Commonwealth of Puerto Rico, to the Kmart Retirement Savings Plan for Puerto Rico Employees (the "Kmart Puerto Rico Savings Plan"). The Kmart Puerto Rico Savings Plan was merged with and into the Sears Puerto Rico Savings Plan at the close of business on March 31, 2012 and the merged plan was renamed the Sears Holdings Puerto Rico Savings Plan and the Company (in the place of Sears) was named as the plan sponsor of the Sears Holdings Puerto Rico Savings Plan.
>
> Effective as of April 1, 2012, the Company (in the place of Sears) was named as the plan sponsor of the Plan.
>
> The Sears Holdings 401(k) Savings Plan Master Trust (the "Master Trust") was established for the safekeeping of Plan assets and to commingle the investment of Plan assets with those of the other participating plans. Effective January 30, 2014, the Master Trust

was renamed as the Sears Holdings Savings Plan Master Trust and the Company (in the place of Sears) was named as its sponsor. The other participating plan in the Master Trust is the Sears Puerto Rico Plan.

*Administration* - The administration of the Plan's operations is the sole responsibility of the Plan Administrator. The Sears Holdings Corporation Administrative Committee ("Administrative Committee") is Plan Administrator for all purposes of the Employee Retirement Income Security Act of 1974 ("ERISA"). The members of this committee are employees of Sears Holdings Management Corporation.

State Street Bank and Trust Company serves as the trustee (the "Trustee") for the Master Trust and holds the investments of the Plan under the terms of a trust agreement, which was fully amended and restated as of January 30, 2014. Hewitt Associates, LLC ("Aon Hewitt"), a subsidiary of Aon Corporation, serves as the Plan's recordkeeper (the "Recordkeeper").

The Company, the Administrative Committee, and the [Committee] (also consisting of employees of Sears Holdings Management Corporation), are the named fiduciaries under the Plan. The [Committee] has authority relating to the acquisition, retention and disposition of Plan assets and the appointment, retention, and termination of investment managers. Towers Watson Investment Services, Inc. has been appointed to serve as investment advisor.

Certain expenses incurred in connection with the operation of the Plan are paid from Master Trust assets. Brokers' commissions and related expenses on transactions in portfolio securities are also paid from Master Trust assets. Compensation to members of the [Committee] is paid by Sears Holdings Management Corporation, not the Plan or Master Trust.

*Eligibility* - A full-time regular or part-time regular employee of the Company (including participating subsidiaries and affiliates) who satisfies the definition of eligible employee is eligible for participation on the first day of the third month following the date of hire.

*Participants' Contributions and Investment Options* - An eligible employee becomes a participant by electing to make contributions to the Plan and properly completing the enrollment process. Subject to certain statutory and Plan limits, participants may contribute up to an aggregate 50 percent of annual eligible compensation through a combination of pre-tax (up to 50 percent) and/or after-tax

contributions (up to 25 percent). Participants turning age 50 or older during a plan year are eligible to make an additional pre-tax "catch-up" contribution up to the applicable Internal Revenue Service catch-up contribution limit.

A Highly Compensated Employee's (as defined in the Plan Document) pre-tax contributions are limited to two percent of his or her eligible compensation and after-tax contributions are limited to zero percent of his or her eligible compensation. The Administrative Committee reserves the right to adjust these limits on Highly Compensated Employees during the Plan year depending on non-discrimination results.

Participants may direct that pre-tax and after-tax contributions be invested in any combination of the following investment funds: the Sears Holdings Corporation Stock Fund ("Holdings Stock Fund"), which invests principally in Sears Holdings Corporation stock; the Stable Value Fund; the Bond Fund; the U.S. Bond Index Fund; the S&P 500 Index Fund; the Small-Mid Cap Value Fund; the Small-Mid Cap Growth Fund; the Small-Mid Cap Index Fund; the Large Cap Value Fund; the Large Cap Growth Fund; the International Equity Fund; the Global Equity Index Fund; any of four Target Retirement Funds (five funds prior to March 2015); and the Self-Managed Brokerage Account (through which a participant may invest in any number of mutual funds, common stock and other investments). Participants are immediately fully vested in their contributions and earnings thereon.

***Employer Contributions*** - Through payroll periods ended January 31, 2009, the Company matching contribution was fixed at 100 percent of a participant's pre-tax contributions up to the first three percent of eligible compensation and 50 percent of the pre-tax contributions the participant made on the next two percent of eligible compensation. These contributions were intended to constitute qualified non-elective matching contributions under Sections 401(k)(12) and 401(m)(11) of the Internal Revenue Code (i.e., the Plan was a safe harbor 401(k) plan).

The Plan was amended to suspend the employer matching contributions for payroll periods that ended after January 31, 2009, until further amendment of the Plan. As a result, effective January 1, 2009, the Plan is no longer intended to satisfy Sections 401(k)(12) and 401(m)(11) of the Internal Revenue Code; accordingly, the Plan is no longer a safe harbor 401(k) plan.

Prior to the suspension of matching contributions, the Plan allowed for the Company matching contribution to be made quarterly and to

be payable in cash or stock or a combination of both. If in cash, it was invested based on participants' pre-tax contribution elections. If in stock, it was invested in the Holdings Stock Fund. Contributions were available for diversification immediately upon deposit. Prior to the suspension of matching contributions, to be eligible for the Company matching contribution, a participant must have had one year of service and been credited with 1,000 hours of service by that date. All active participants in the Plan are immediately fully vested in the Company matching contribution (other than the discretionary matching contributions described below). Prior to April 1, 2012, the vested status of a participant who terminated employment prior to January 1, 2006, was determined based upon the terms of the Plan in effect at his or her date of termination. As of April 1, 2012, the plan administrator determined that all account balances of active and inactive participants were fully vested, including matching contributions. Participants should refer to the Plan Document for a more complete description of the Plan's vesting provisions.

The Plan includes a provision that allows for discretionary matching contributions. Discretionary matching contributions, if any, are subject to a three-year cliff vesting schedule. There were no discretionary matching contributions in 2015 and 2014.

*Participant Accounts* - Individual accounts are maintained for each Plan participant. Each participant's account is credited with the participant's contribution, allocation of the Company's contribution and earnings and losses thereon, and is charged with withdrawals and an allocation of administrative expenses. Allocations are based on participant earnings or account balances, as defined in the Plan Document.

\* \* \*

*ERISA* - The Plan is subject to certain provisions of Titles I and II of ERISA relating to reporting and disclosure, participation and vesting, and fiduciary responsibility. The Plan is not subject to the minimum funding standards of Titles I and II and the provisions of Title IV of ERISA, which provide for insurance of benefits payable on Plan termination.

**The Holdings Stock Fund**

38.     One of the investment options offered under the Plan was the Fund.  As noted in

the 2015 Form 11-K, the Fund "invests principally in Sears Holdings Corporation stock."

16

39.     Upon information and belief, the vast majority of the Fund was, in fact, invested in Sears Stock.

40.     Sears Stock has been predictably declining since 2010, as shown by the following chart from Google Finance:



41.     Compared to major indices, the underperformance of Sears Stock is obvious:



42.     This underperformance is Sears specific.  While Sears does not identify a peer group in its proxy statement and while Plaintiff is not aware what, if any, benchmark was used to evaluate the Fund's performance, Sears Stock has significantly underperformed the SPDR S&P Retail Exchange Traded Fund (NYSEARCA:XRT):



43.     Despite the problems alleged herein, the Fund imprudently acquired and held Sears

Stock during the Class Period and lost tens of millions of dollars of Participant's retirement savings

as a result of Defendants' breaches of their fiduciary duties.  As shown by the 2015 Form 11-K,

the Fund lost $4.514 million in 2014 and $12.859 million in 2015.  Data since year end 2015 are

not publicly available, but based upon Sears Stock's considerable price decrease and the Fund's

holdings of $31.255 million at year-end 2015, the Plan had considerable damages.

44.     Based upon the Plan's reported holdings of Sears Stock worth $31.255 million at

year end 2015 and $47.830 million at year end 2014, it appears based upon respective closing

prices of $20.56 and $32.98 for 2015 and 2014, the Plan held approximately 1,520,185 shares of

Sears Stock at year end 2015 and approximately 1,450,273 shares of Sears Stock at year-end 2014.

Data since year end 2015 are not yet publicly available.

45.     In December 2016, Participants were advised through a Summary Annual Report

(the "2016 SAR") of certain Notice of Changes to the Savings Plans, including the following:

> The Sears Holdings Corporation Stock Fund that is part of the
> Savings Plan (the "Stock Fund"): This fund will be closed to new
> investments. Starting January 1, 2017:
>
>> • You will not be able to allocate contributions or transfer
>> amounts in other investment options to the Stock Fund.

• Any existing Stock Fund balance will remain in place unless you voluntarily transfer assets out of the Stock Fund. If you transfer any amount in the Stock Fund to a different investment option, you will not be able to move that amount back into the Stock Fund. However, you will be able to leave balances in the Stock Fund as long as you are a participant.

• If your investment election includes the Stock Fund, you will need to change that, effective January 1, 2017. Otherwise, starting January 1, 2017, all amounts that would have been allocated to the Stock Fund, including contributions, automatic rebalancing, and loan repayments, will be automatically invested in the Target Retirement Fund appropriate for your current age. This change will apply to all plan participants.

46.     It appears that this closing of the Fund to new investments (the "Freeze") was disclosed on January 27, 2017 through a Form S-8 POS and two Forms 15-12B and two Forms 15-12G filed with the SEC.  The SEC filings were filed after markets closed, and Sears Stock, which had closed at $7.42/share, opened the next day at $7.26 per share.  The decline was not related to Defendants' actions: as *The Motley Fool* reported in a January 27, 2017 article published after markets closed, and after the Freeze-related SEC filings were issued:

Shares of Sears Holdings Corp (NASDAQ:SHLD) were on the chopping block today as the stock continued to fall on concerns about an imminent bankruptcy. As of 2:54 p.m. EST, shares were down 9.7%.

**So what**

The retailer's stock began dropping on Wednesday after Fitch Ratings issued a foreboding note on the struggling department-store chain. The ratings agency said that significant cash burn could soon lead to liquidity issues, and it maintained a dubious rating of CC on Sears debt despite the retailer's efforts to restructure in recent years.

Sears' stock has fallen 24% in the last three days since the report came out. Though ***there was no news today***, investors are clearly rattled by what appears to the company's impending doom.

<u>**Class Action Allegations**</u>

19

47.     Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and to the extent necessary as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, as well as any other plan that was administered in a materially identical way and had its assets comingled in the Sears Holdings 401(k) Savings Plan Master Trust,[10] at any time from July 14, 2014 to the present, inclusive (the "Class Period"),[11] and whose Plan accounts included investments in Sears Stock.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of employees of the Plan who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Sears Stock.  A Form 5500 Annual Return/Report of Employee Benefit Plan filed on behalf of the Plan on August 25, 2016, shows the Plan had 207,310 Participants at the start of 2015 and 56,398 Participants at the end of 2015.

49.     At least one central common question of law or fact exists as to Plaintiff and all members of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

---

[10] Sears referred to the Plan and the Sears Holdings Puerto Rico Savings Plan, collectively, as the "Savings Plans" in SEC filings. The Plans shared the same handbook and seem to have been concurrently administered and managed by the same persons.

[11] Plaintiff's Class Period is ongoing and reflects a continuing breach.  Plaintiff reserves the right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Sears Stock was an imprudent investment option for the Plan.

a. whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

b. whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c. whether Defendants violated ERISA; and

d. whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

50. Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

51. Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class. In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

52. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

53. Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act

on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## Facts Bearing Upon Defendants' Fiduciary Breaches

54. Per Capital IQ, the last time Sears reported positive EBITDA was FY2012; $203MM on the back of a balance sheet that had $3.5BN in debt and cash of $750MM.

55. In 2012, 2013, and 2014, Sears spun out Sears Canada, Orchard Supply Hardware, Sears Homes & Outlet, and Lands' End (Sears Canada & Orchard Supply are now bankrupt) raising nearly $1.5BN to fund Sears's highly overwhelming cash burn, which appeared to be inescapably pushing Sears towards bankruptcy.

56. When Defendant Lampert took over as CEO in early 2013, he was the Company's fifth CEO in seven years. As the *Chicago Tribune* reported on January 11, 2014, "Lampert has confounded retail analysts by introducing and abandoning one strategy after another. Lampert also has pitted executives against one another by dividing the company into separate operating units, according to dozens of former executives."

57. By no later than the start of the Class Period, it was apparent that there was a sea-change in the retail industry. Sears had not had a profitable quarter from business operations since 2010, and had cannibalized valuable assets to raise money to survive. *See supra* ¶¶ 2-3. Objective measures such as Sears's debt-to-equity ratio rose significantly and then turned negative to reflect that Sears's shareholder base has negative total equity (see supra n.4),[12] and the Sears's Z-score confirmed that it was distressed. As a result of Sears's objective troubles, an unusually high

---

[12] *See* https://ycharts.com/companies/SHLD/shareholders_equity.

amount of its shares were sold short, indicating that an unusually high amount of market participants believed Sears Stock's price would decline.[13]

58. Little, if any, objective data showed any reasonable "long-term potential for appreciation" for Sears Stock (¶ 33) given Sears's inability to generate any profit and lack of any realistic strategy to do so.

59. Approximately six months before the start of the Class Period, on January 10, 2014, *The Wall Street Journal* reported in an article entitled "Moody's Cuts Sears Rating Following Dismal Outlook; Rating Is Currently in 'Highly Speculative' Territory" the following:

> Moody's Investors Service downgraded Sears Holdings Corp. deeper into junk territory, citing the department-store operator's weaker-than-expected 2013 performance and expectations of more difficulties this year.
>
> The ratings cut comes a day after Sears projected adjusted losses for the fiscal fourth quarter and full year that badly missed Wall Street's expectations, as the company warned of continued same-store sales weakness.
>
> Shares of Sears, which reported weaker sales at both the namesake domestic stores and Kmart, fell 14% in recent Friday afternoon trading.
>
> "While Sears noted improved engagement metrics for its "Shop Your Way" Rewards program, Moody's remains uncertain when these improved engagement metrics will lead to stabilization of operating performance," Moody's Vice President Scott Tuhy wrote in his report.
>
> The retailer's corporate family rating was cut by one notch to Caa1, placing the rating seven levels into junk and into "highly speculative" territory.
>
> Moody's expects Sears to burn around $1.2 billion of cash in 2013, and projected around $1 billion in cash burn this year.

---

[13] *See* https://www.gurufocus.com/ownership/SHLD.

That view comes after some observers questioned the company's future viability. For example, a longtime bearish analyst at Credit Suisse sees a remote likelihood of a turnaround as Sears loses market share to stronger retailers and passes off its good locations and profitable segments.

60.    Also on January 10, 2014, *Dow Jones Institutional News* reported:

"Sears Holdings' earnings continue to shock on the downside, **with each quarter seemingly worse than the previous one," Credit Suisse says. Firm notes SHLD has gone from "a moderate positive cash flow retailer a few years back," to "a $1.2 billion negative cash flow story" in 2013. "One wonders how long this story will go on. The bulls on the stock continue to point to the underlying assets, but by continuing to operate, Sears is reducing that value now by nearly an astonishing $10 to $14 a share per year,"** analyst Gary Balter writes. Shares down almost 13% premarket at $37.20 after warning late yesterday of steep F4Q losses.

61.    Credit Suisse analyst Gary Balter, one of the few analysts who covered Sears by the start of the Class Period, maintained its Underperform rating with a price target of $20, as compared with its closing price of $36.71, thus predicting Sears Stock's price would fall sharply.

62.    By the start of the Class Period, Sears's analyst calls were pre-recorded and so there was no analyst participation. By contrast, a transcript of Sears's Q1 2013 Sears Holdings Corp Earnings Conference Call shows that five analysts participated therein.

63.    Approximately two months before the start of the Class Period, on May 6, 2014, Sears held its annual shareholders' meeting. Of the meeting, *Crain's Chicago Business* reported in an article titled "At Sears, 'closing stores is going to be part of our future'" that Defendant Lampert recognized, in part "Closing stores is going to be part of our future. I'd rather do (fewer closures) rather than more, but the world has shifted." The article further reported:

Speaking more philosophically about Sears' well-publicized financial struggles, Mr. Lampert reiterated now-familiar themes of transformation and technology while acknowledging the retailer has yet to succeed with its "profit recovery plan."

* * *

24

> Overall, Mr. Lampert acknowledged Sears' struggles and said the questions about the company's financial struggles were fair, but that they have obscured real progress taking place.
>
> He said Sears has hired some of the best minds in retail, and the lack of immediate financial improvement points to a radical industry transformation underway.
>
> "When the best people in an industry have a very hard time producing results, is it about the people or the industry?" he said.
>
> "You used to push a button and the door opened," he continued. "It doesn't work that way anymore. Some people continue to push the button; other people figure out a new way to make the door open."

64.     On May 22, 2014, *Bloomberg* reported that Chicago-based investment research firm Morningstar has dropped coverage of Sears Holdings, once the nation's largest retail chain. Morningstar's retail analyst, Paul Swinand, discontinued coverage as of March 18, according to a company note, which noted that before dropping coverage, the firm had rated Sears the lowest of three rankings that reflect a company's ability to best its competitors.

65.     Had defendants weighed its "long-term potential for appreciation" against the "likelihood and duration of investment losses" (¶ 33) given that Sears's "profit recovery plan" had been unsuccessful for years and "a radical industry transformation," prudent ERISA fiduciaries would have taken action to protect Participants' retirement savings, and would have ceased allowing the Plan to hold and/or purchase Sears Stock.  Instead, Defendants took no action until December 2016, at which time they merely froze future purchases of Sears Stock, thus doing far too little, far too late, as Participants' retirement savings decreased.

66.     If, at the start of the Class Period, Defendants had considered objective data regarding the "long-term potential for appreciation" of Sears against the "likelihood and duration of investment losses," they would have necessarily concluded that Sears was, as Defendant Lampert suggested, "hav[ing] a very hard time producing results" in a struggling industry despite

best efforts. Defendants had no objective reason to believe that would change, but they chose to allow the Plan to stay the course despite their fiduciary charge (¶ 33).

67.     On September 10, 2014, Fitch Ratings downgraded its long-term Issuer Default Ratings (IDR) on Sears Holdings Corporation (Holdings) and its various subsidiary entities (collectively, Sears) to 'CC' from 'CCC', indicating the investments were non-investment grade and currently vulnerable and dependent on favorable economic conditions to meet its commitments, with the following "KEY RATING DRIVERS":

> EBITDA Materially Negative: The magnitude of Sears' decline in profitability and lack of visibility to turn operations around remains a significant concern. EBITDA for Sears Holdings Corporation (Sears or Holdings) is expected to be negative $1 billion in 2014 (with LTM EBITDA through Aug. 2, 2014 at negative $860 million) and potentially worse in 2015, after turning negative $337 million in 2013.

> Fitch expects top-line contraction of around 9% to 10% in 2014 due to estimated domestic comparable store sales (comps) of negative 1%-negative 2%, loss of Lands' End business (4.3% of 2013 consolidated sales), and ongoing store closings. Gross margins are expected to contract another 200 bps to 22%, on top of the 220 bps contraction in 2013. Fitch does not expect any catalysts in the business that will stem the rate of decline.

> Cash Burn Significant Concern: *Sears needs to generate a minimum EBITDA of $1 billion annually between 2014 through 2016 to service cash interest expense, capex, and pension plan contributions. Given Fitch's projections for EBITDA to be negative $1 billion or worse, cash burn (prior to any working capital benefit) is expected to be around $2 billion or higher annually*. In addition, Sears needs an estimated $600 million to $700 million in liquidity to fund seasonal holiday working capital needs.

> Funding Options May Not Be Enough to Support Operations Beyond 2016: Given the significant cash burn in the business, Sears injected $2 billion in liquidity in 2012 and $2.5 billion in 2013 through cuts in inventory buys, asset sales, real estate transactions and the issuance of a $1 billion five-year first lien secured loan in October 2013.

Through the first half of 2014, Sears has generated $665 million in proceeds, including a $500M exit dividend from the separation of Lands' End and another $164 million from real estate transactions. Below is a summary of potential sources of liquidity:

--Asset sales: Sears announced in mid-May that it is exploring strategic alternatives for its 51% interest in Sears Canada (with its stake valued at approximately $765 million based on market cap as of August end), including a potential sale of Sears Holdings' interest or Sears Canada as a whole. Fitch notes that EBITDA at Sears Canada has declined significantly as well, with LTM EBITDA loss of $39 million on revenues of $3.5 billion. The company is also evaluating options to separate its Sears Auto Center business.

--Second lien notes: The ability to issue $760 million in second lien debt as permissible under the company's credit facility is subject to borrowing base requirements. Given the significant reduction in inventory over the past three years, the ability to issue this debt has been constrained over the past three quarters. Fitch expects that the ability to issue this debt even at holiday peak inventory levels (with domestic inventory expected to be at $6.7 billion to $6.9 billion) could be limited as Sears will need to increase borrowings under the revolver to fund the holiday merchandise, unless it generates adequate proceeds through asset sales first.

--Working Capital: Fitch expects working capital to be a $400 to $500 million source of funds this year between ongoing reduction in inventory due to the contraction in its core businesses, store closings and the spinoff of Lands' End.

--Real estate backed debt on unencumbered property: Sears owned 367 Sears full line stores, 183 Kmart discount units and 12 Kmart supercenters at the end of 2013 which were unencumbered. Sears could seek to do a real-estate backed transaction that could potentially be in the range of $2.0-$2.5 billion using a similar approach to valuing the real estate that was used by J.C. Penney to raise a $2.25 billion term loan in May 2013. However, the significant deterioration in Sears business and the lack of visibility on a turnaround could limit this option. This does not contemplate a series of small real estate transactions that could also involve landlords assuming some of Kmart's and Sears' leases in highly productive malls.

Should Sears even be able to execute on a number of these fronts and generate $4.0 to $6 billion in proceeds, given the high rate of cash burn in the business, these actions would take them through

2016. As a result, *Fitch expects that the risk of restructuring is high over the next 24 months.*

68.     On September 10, 2014, *Dow Jones Institutional News* reported that:

> Sears's 6.625% bonds due October 2015 are down 1.4 cents on the dollar to 90.1 cents, per online bond trading platform MarketAxees, lifting their yield to 9.613%. The company's longer-term bonds are in far worse shape: its 7.5% notes due 2027 trade at 58.5 cents on the dollar to yield 14.7%, and its 7% bonds due 2042 trade at just 13.7 cents and yield 54.5%, per MarketAxess.

69.     On December 5, 2014, *The Wall Street Journal* published an article entitled "Sears Can't Shake Burning Question; Will Cash Last Long Enough to Get Retailer Back on Track?" which reported, in relevant part:

> Will Sears Holdings start making money before it loses all the money it has to lose? That is the essential question investors face when thinking about the struggling retailer.
>
> Sears on Thursday reported sales in its fiscal third quarter ended November of $7.2 billion, down $1.1 billion from a year earlier. Most of that decline was due to three things: the spinoff of its Lands' End business earlier this year, the reduction in its Sears Canada stake and the 187 stores it closed over the past year. Sears posted a loss of $548 million, similar to its year-earlier loss of $534 million. So far this year, its operations have burned through $2.1 billion of cash, according to Evercore ISI.

[14]



To counteract the bleeding, Sears has engaged in a number of maneuvers to raise cash. In addition to the Lands' End spinoff and the Sears Canada sales, it has sold debt to its shareholders, taken a short-term loan from Chief Executive Edward Lampert, leased space to European fashion retailer Primark and sold a store in Cupertino, Calif. An adjusted figure the company provided showed that had the rights offerings related to its debt and Sears Canada sales been completed by the end of the quarter, it would have had $1.4 billion in cash and short-term credit available.

But at the rate it is losing money, this liquidity could drain quickly. So Sears is considering putting 200 to 300 of its stores into a real-estate investment trust that it would then sell to its shareholders. That might buy it another year's worth of liquidity, but may also represent the last substantial cash-raising arrow it has left in its quiver.

Turning a profit would be the more sustainable solution to Sears's cash problems. To that end it says it is in the process of closing more underperforming stores and that it aims to become "a more asset-light, member-focused business" that integrates in-store and Internet shopping. Progress on that front, though, looks mixed.

On the one hand, Sears said online and multichannel sales (such as purchases that are initiated online and then picked up at a store) were up 9% in the third quarter. Yet Wal-Mart reported that its e-commerce sales rose 21%.

---

[14] Free cash flow (FCF) is a measure of a company's financial performance, calculated as operating cash flow minus capital expenditures. FCF represents the cash that a company is able to generate after spending the money required to maintain or expand its asset base.

> *It isn't possible to say definitively whether Sears will be able to keep outrunning its losses. But two things are clear: Those losses continue and Sears's options for raising cash are dwindling.*

70.     On February 19, 2015, *CFO.com* reported in an article entitled "CDS Investors Bearish on Sears" that:

> The spread on a one-year swap contract to insure against a Sears default rose significantly this week.
>
> The chances are increasing that Sears will follow in the footsteps of RadioShack and default on its debt and then possibly file for bankruptcy - at least that's what some credit default swaps traders think.
>
> According to CMA, a privately-negotiated market for credit swaps, the price of contracts insuring against a Sears default within a year rose to the equivalent of 1,434 basis points on Wednesday, Bloomberg reported. For five-year protection, the price was 1,247 basis points.
>
> A basis point equals $1,000 annually on a contract protecting $10 million of debt. To insure a $100 million loan to Sears for one year, for example, it would cost a lender $14 million.
>
> The price increase for a one-year contract compared with a five-year contract reflects deteriorating investor confidence that Sears can avoid a default in the near term, Bloomberg wrote.
>
> "It's becoming increasing clear that this year is going to be the tipping point for liquidity," CreditSights analyst James Goldstein told Bloomberg. "Their underlying retail model remains broken, and if it continues like this, it sucks the lifeblood out of whatever remaining value there is in its real estate."

71.     On February 26, 2015, a *RealMoney* article entitled "22 Reasons Why the End Is Near for Sears" opined that "[t]he death of Sears will ultimately transpire because of the meaningful changes in retail that it's not partaking in, for one because its execs don't care to partake in them, and two the company's financial state doesn't afford it the ability to invest" and listed "22 reasons, broken down by major Sears competitors, why five years of bad news is ahead for the zombie retailer."

72.     On February 28, 2015, a *Chicago Tribune* article entitled "Sears still in retail spin; Hoffman Estates-based company struggles through brutal 4th quarter, while rival J.C. Penney starts to see success in its return to discounting" which reported, in relevant part:

> It's been a rough road for department stores in recent years, as cash-strapped, bargain-hungry consumers cut back spending and increasingly turn to their computers to do their shopping.
>
> Two iconic brands, Sears and J.C. Penney, have been hit particularly hard and are trying to transform from relics to fresher, more nimble retailers that give shoppers what they want -- good prices and merchandise they can buy anytime, anywhere.
>
> But results released this week suggest that while Sears continues to struggle, J.C. Penney is turning a corner.
>
> * * *
>
> Meanwhile, Hoffman Estates-based Sears Holdings Corp., which operates 128-year-old Sears and its sister chain Kmart, continued its downward spiral, reporting on Thursday a 13.6 percent revenue decline for the quarter that ended Feb. 1 and a $358 million loss even as it continues to build and tout its "Shop Your Way" membership-based rewards program.
>
> "J.C. Penney has had turmoil, but the ship is getting righted and that's not happening at Sears," said Craig Johnson, president of Customer Growth Partners, a New Canaan, Conn.-based retail consultancy. "Sears used to stand like a colossus above the retail landscape and now it's a shadow of its former self."
>
> * * *
>
> To preserve cash and fund further investment in Shop Your Way, Sears also has been selling off assets.
>
> Last year, it announced plans to separate its Lands' End clothing brand and auto-service centers. Lampert expects those efforts and others to raise $1 billion this fiscal year.
>
> * * *
>
> "I have great doubt that they will be able to grow Shop Your Way Rewards in a way that's meaningful enough to offset the huge operating declines they are experiencing in their retail operations,"

said Matt McGinley, managing director at International Strategy and Investment Group.

Credit Suisse analyst Gary Balter wrote in a note that the discounts offered by the Shop Your Way Rewards program have further reduced margins in a company that is already consistently losing money.

"If they'd moved to this type of model a decade ago when they had more cash ... they might have offset these declines," McGinley said.

73.     On March 19th, 2015, analysts at Vetr downgraded Sears Stock from a "sell" rating to a "strong sell" rating and set a $34.00 price target on the stock in a research note. According to *American Banking and Market News*, no other analysts covered Sears Stock then.

74.     On April 02, 2015, *Fashonista* quoted analyst Brian Sozzi, CEO of Belus Capital Advisors, as stating "Sears is no longer a department store, it's a zombie." "The apparel assortments never seem to be on point, and markdowns are perpetually high. To me, Sears is just existing, and will continue to lose massive apparel share to Macy's, J.C. Penney, Kohl's, and all of the fast fashion retailers," he said.

75.     On July 1, 2015, Standards & Poor's ("S&P") affirmed Sears's "CCC+" rating, noting a non-investment grade asset with "substantial risks", noting in part:

> "The rating affirmation reflects our expectation that the company maintains sufficient liquidity to fund cash losses from the retail business into at least late 2016, taking into account the proceeds Sears expects to realize from the pending REIT transaction," said credit analyst Robert Schulz. "Because of the very high leverage from ongoing negative EBITDA versus existing debt balances, we continue to view the capital structure as unsustainable under our criteria, although we do not envision a near term credit or payment crisis. We believe the still-substantial unencumbered assets have value, potentially independent of Sears' current business struggles. We believe Sears could use these assets to generate liquidity, but progress in stabilizing sales and improving earnings and cash flow are important to avoid an eventual restructuring."

76.     On August 20, 2015, *Dow Jones Institutional News* reported in an article entitled

"Sears: And Then There Were None? -- Barron's Blog" that:

> Sears (SHLD) reported earnings this morning and I'd love to tell
> you what analysts thought but there's a slight problem--there are
> almost no analysts covering the stock anymore.
>
> According to Bloomberg, just two firms cover Sears these days,
> Evercore ISI and E VA Dimensions, with the latter being primarily
> quantitative. All the bulge bracket firms have decided that Sears is
> no longer worth covering. Maybe that's because the only people
> who really own the stock now are Eddie Lampert, his hedge fund
> and Fairholme Capital, which own nearly three quarters of the
> company, according to FacSet data. And maybe because they've
> spun out Land's End (LE) and Seritage Growth Properties (SRG).
>
> Anyway, Sears reported a profit of $208 million thanks to the sale
> of some stores to Seritage Growth Properties, which made the
> company $508 million. Exclude the sale and some other items and
> Sears lost $256 million.
>
> What does this all mean for Sears? Bloomberg quotes Evercore ISI's
> Matt McGinley, who calls chances for a turnaround "very
> dim...they're still burning a tremendous amount of cash, and it's
> actually gotten worse year over year."
>
> Too bad there's no one else to ask.

77.     On December 2, 2015, *The Wall Street Journal* published an article entitled

"Sears's Retooling Can't Fix Everything; Sears's financial maneuvers could provide short-term

opportunities, but they won't change a grim long-term trend" which reported in part:

> ***There are investments and there are trades. The difference
> between the two is notable when it comes to Sears Holding Corp.***
>
> Since 2010, the once iconic retailer has become a shadow of its
> former self. Its share price has fallen to the $20s from the $90s, while
> its market value today is one-tenth of the nearly $26 billion it fetched
> a decade ago.
>
> Shorter time horizons, though, have often told a different story. On
> nine occasions over the past five years, Sears's shares have popped
> more than 20% over two-week stretches.

Whether quarterly results weren't as bad as expected, or Sears was unloading assets to bolster cash, the stock has provided savvy short-term traders with opportunities. Meanwhile, it has burned those of the buy-and-hold variety.

\* \* \*

Faced with declining sales and waning shopper traffic, Sears has been cutting costs and unloading properties. Financial engineering has bought Sears more time as it attempts to transform itself in the digital age.

Sears spun off 235 properties into a real-estate investment trust earlier this year and has created joint ventures with three mall owners. Those moves generated $3 billion in proceeds.

Yet Sears still needs to cover its massive operating losses. *And unless fundamentals drastically improve, Sears will likely need to embark on more financial maneuvering sooner than later. Evercore ISI estimates that Sears will keep burning through $1 billion in cash annually.*

Any further engineering could indeed provide more short-term succor for traders. But they aren't likely to alter the grim long-term trend.

Same-store sales, for example, have fallen in the past seven quarters, including double-digit percentage declines in each of the past two. Sears recently snapped a streak of 12 consecutive quarters in the red, but that was only because of its real-estate spinoffs.

*Sears prowess at selling assets isn't matched by much success selling merchandise. Until it is, the stock will be nothing more than a trader's plaything.*

78. On December 10, 2015, *The Motley Fool* published an article entitled "Without Real Estate, What Does Sears Holdings Corp Have Left to Offer? With its stores to prop up its value and sales still falling through the floor, why invest in the retailer's stock?" which reported in part:[15]

---

[15] *The Motley Fool* subsequently reported on January 4, 2017, that "Chairman and CEO Eddie Lampert created [Seritage] in 2015 to serve as the vehicle to help the retailer monetize its asset portfolio, is making a mint off the company's woes."

The real estate investment trust that was supposed to transform Sears Holdings (NASDAQ:SHLD) is finally doing its thing. However, it's not happening the way investors imagined when the idea was first revealed and the retailer's stock was sent soaring by the value that was about to be unlocked.

**A zombie business**

Instead, it's more apparent than ever that Sears is an empty shell of its former self. ***Without the real estate around to prop up its value, what's left is an aging retailer with clothes and household goods no one wants to buy.*** Comparable store sales at its namesake Sears stores were down nearly 10% in the third quarter, while those at its Kmart chain were down 7.5%, though that's a story investors are all too familiar with. Adjusted losses worsened to $305 million, or $2.86 per share, compared to an adjusted loss of $288 million, or $2.71 per share in the same period last year.

It's been something of a tenet of faith among long-suffering shareholders that the chain's real estate was the biggest upside of this declining business. Having watched chairman and CEO Eddie Lampert dismantle the company bit by bit over the years -- selling off an asset here or spinning off a valuable brand there -- it became a situation where the real estate really was the only thing holding it all together. Other than the few brands like Diehard, Kenmore, and Craftsman, it was Sears' land and buildings that still had value.

And now they're going, too.

**Nothing left but bricks and mortar**

When Lampert created the Seritage Growth Properties (NYSE:SRG) REIT, he seeded it with over 260 stores that he then leased back, generating some $2.5 billion for the retailer. He also cobbled together deals with mall operators General Growth Properties, Simon Property Group, and Macerich that raised another $3 billion.

He has used part of the proceeds to pay down some of Sears' substantial debt, and at the end of the current quarter, debt levels stood at just over $2.1 billion, down from $3.1 billion at the start of the year, but it ended the period with $294 million in cash and $963 million in immediately available credit.

\* \* \*

35

### Pulling on the thread

What we do have is a retailer that can't sell the goods it has and is burning through cash. It has yet to figure out how it will reverse the consistent decline in sales it's been experiencing. Sales fell by another $1.5 billion in the third quarter, though a large part of that can be attributed to the 144 stores it shuttered as it aggressively tries to minimize the impact of underperforming locations.

But even those stores that remain can't attract customers. While rivals like Wal-Mart and Target also struggle to regain their footing, they were at least able to notch higher comps for the period. They also have made significant investments in an omnichannel model.

\* \* \*

The fact is, Sears Holdings can barely compete against its rivals in the brick-and-mortar space, let alone in the digital world. Having neglected his stores for so long and waiting an eternity before trying to monetize them, CEO Lampert has left the chain bereft of any real value. His reliance upon one-time financial gimmicks to prop up the stock has caused a massive void to appear when there are no more rabbits to pull out of the hat.

Even those investors who have stuck around through thick and thin (or more like thin and thin with Sears) are now abandoning the retailer. ***There's not much left worth salvaging, and brave talk about positioning the company for a profitable future is just that -- and not many are believing it anymore.***

79. On February 9, 2016, *The Daily Herald* (Everett, Washington) reported in an article entitled "Sears analyst says company isn't viable" that Evercore ISI analyst Greg Melich said in a report that Sears is no longer "viable as a retailer in its current form." The article further reports:

A shrinking cash pile and narrower gross margins will require the money-losing company to take on more debt this year, Evercore ISI analyst Greg Melich said in a report, which he co- wrote with Matt McGinley. Even if it gets through 2016, Sears faces a "larger liquidity event" — a cash crunch requiring some action — the following year, Melich said. His firm is one of the few still tracking Sears, which it rates a sell.

\* \* \*

"Sears margins were worse than we thought as a tough retail climate accelerated margin decline," the analysts said in the report. "A liquidity event is a matter of when not if."

\* \* \*

"Sears continues to struggle to transform," he said. "Its inability to generate cash makes it likely it will need to sell assets or utilize its funding facility in 2016 to offset operating losses."

80.     On February 26, 2016, *Bloomberg Gadfly* reported in an article entitled "Sears CEO All Talk, No Action" in part:

So let's go back to 2006 -- shortly after Lampert orchestrated the merger of Sears and K-Mart and took the reins of the newly formed Sears Holdings. At the time, Sears' enterprise value stood at $22 billion, it took in $49 billion in annual revenue and made $2.2 billion in cash from operations. Today, its enterprise value is around $4 billion, and it's been five years since the company reported a profit.

By any financial measure -- sales, profit, cash flow -- Lampert has done nothing but rip apart the retailer. He's also saddled it with a lot of debt, tapping $5 billion in two years from capital raises and asset sales. He's sold off divisions such as Lands End and Sears Canada and spun off the bulk of the company's best properties into a real estate investment trust. He used all of that money to fund the operations of a company that continues to bleed cash.

\* \* \*

Lampert extols the retailer's mobile sales growth and "Shop Your Way" membership program. But even he admitted in this year's shareholder letter that, despite investment in transforming the company into a more digital retailer, it still makes the bulk of its money from its stores -- a quickly declining proposition.

So now the company is running out of assets to sell; its auto centers and brand names such as Kenmore and Craftsman are likely the next to go. And its ability to borrow money is drying up, starting in April, when it will lose $1.3 billion in revolving credit availability, according to Bloomberg Intelligence analyst Noel Hebert. The company is burning through cash so fast, a number of analysts surveyed by Gadfly give Sears about two years before it's forced to fold.

81.     On December 31, 2016, Sears disclosed that its cash and equivalents fell to $258 million in the third quarter, down from $294 million a year ago as a result of another three months of stunning losses. Secondly, Sears only had $174 million of availability left under its $1.971 billion credit facility, compared with $963 million a year prior.   Sears also disclosed its ninth consecutive same-store sales decline, a decline of 10%.

82.     On February 7, 2017, *Fortnue.com* reported in an article entitled "Bond Traders Are Betting Sears Will Go Out of Business in Two Years" that:

> Bond traders are rapidly losing faith in Sears' ability to stay alive.
>
> The price to insure $10 million of Sears bonds against default has risen to $4.6 million a year, meaning that holding the bond insurance—called a credit default swap—for a little more than two years will actually cost more money than the principle is worth, according to research firm IHS Markit. Over the full five-year term, it would cost $23 million to insure $10 million in bonds, meaning very few traders who are buying up the bond insurance think the company will last nearly that long. ***The cost per year was $3.3 million as recently as September, and was less than half a million dollars in mid-2013.***

83.     On February 13, 2017, *Bloomberg Gadfly* reported in an article entitled "Beware Sears's Zombie Apocalypse" the following:

> Don't be fooled by Sears's latest stock surge: The retailer may have come back from the dead, but ***its pulse is long gone.***
>
> CEO Eddie Lampert on Friday promised to inject life into the decaying company, sending shares up 26 percent. But investors should think of Sears more like the zombies on AMC's series "The Walking Dead" -- they may moan and meander like they're alive, but they are really rotting undead in search of their next fix.
>
> As we laid out last year, Lampert has spent a fifth of his life promising Sears's rebirth since buying the once-storied retailer more than a decade ago. But anyone who has been to a Sears store lately can see -- judging by the empty shelves, cracked floors, and frustrated employees -- that Lampert is all talk. Friday's promises to restructure the business, cut $1 billion in costs, and return to profitability are no different.

What was once America's largest retailer has lost $8 billion in the past five years. Another round of vows to "cut costs," reduce corporate overhead and improve merchandising isn't going to get people to suddenly shop at Sears again. Neither is under-investing in web sales, where the retailer has fallen woefully behind, despite vows to reinvent itself as a digital operator.

***Sears is bringing in half the revenue it notched in 2007, and sales declines are accelerating as Sears pulls back on even the most basic of store investments*** -- such as fixing leaky ceilings. Revenue fell by a fifth in 2016 from the year before, and any additional cost cuts will just speed up that process.

***Plus, the bones have already been picked dry at Sears: Its property, plant and equipment were worth $2.6 billion in 2016, down from $9 billion in 2007. It went from $500 million in capital expenditures in 2007 to $211 million in 2016, while reducing the number of its employees by 50 percent during that time period.*** (By contrast, Macy's recorded capital spending of $800 million last year.)

And Sears's debt is unwieldy: It has $4.6 billion of funded debt, as well as unfunded pension and other obligations of $2 billion.

To keep his zombie retailer going in spite of the deep losses, Lampert will continue to suck dry its assets, in what has turned into a decades-long garage sale. Sears needs to raise at least ***$2 billion in liquidity in 2017 to fund ongoing operations***, ratings agency Fitch estimates. As long as Lampert can find the cash, Sears will keep feasting on carnage and staggering forward.

84. On March 22, 2017, Sears disclosed in its annual report that its past operating results point to substantial doubt that the company can continue as a going concern. The company issued a press release saying that, "Sears Holdings remains focused on executing our transformation plan and will continue to take actions to help ensure our competitiveness and ability to continue to meet our financial obligations." It also clarified some earlier erroneous media reports by emphasizing that its independent auditors provided Sears Holdings with an "unqualified audit opinion" and the company remains a "going concern."

85. On May 18, 2017, *MarketWatch* reported in an article entitled "Three zombie retailers in danger of disappearing; The retail industry is hurting, and these companies are being pummeled the most" the following:

> Any conversation about zombie retailers has to include Sears Holdings Corp. (SHLD, US). It's a ***story right out of the penny dreadfuls*** – mad scientist Eddie Lampert sews together a dead and bankrupt Kmart with a sickly and struggling Sears, then forces the monster to eat its own arms and legs to survive!
>
> OK, perhaps that's a bit over the top. But ***it's undeniable that Sears has been in deep trouble for years, staying afloat with heavy borrowing, deep cost-cutting and the sale of any business unit that isn't tied down.***
>
> Annual reports show that in fiscal 2012, Sears boasted $19.3 billion in assets and $1.6 billion in long-term debt, but at the end of 2016 saw less than half the assets at $9.4 billion in total, and more than twice the debt at nearly $3.5 billion. No wonder Sears has a credit rating that is ***deep in junk territory after yet another debt downgrade by Moody's in January***.
>
> Also, consider that the company had 735 Kmart stores and 670 full-line Sears locations in the U.S. at the end of 2016, down from 1,221 Kmart stores and 798 full-line Sears stores in 2012. That's a reduction of more than 30% in aggregate across just four years.
>
> Sears still is keeping the lights on with creative solutions, including the recent divestiture of the once-respected Craftsman tool brand that was sold to Stanley Black & Decker Inc. (SWK, US), raising $900 million.
>
> But Sears' stock has declined 85% over the past five years, and the end-game is obvious regardless of stopgap solutions. Sears is a dead retailer walking.

86. On June 19, 2017, *The Motley Fool* reported in an article entitled "This Is Why You Shouldn't Have Gotten Excited By Sears Reporting a Profit; Investors should know by now that good news from the troubled department store operator is usually a mirage" the following:

> The headline news last month that Sears Holdings (NASDAQ:SHLD) turned a quarterly profit for the first time in several years sent its stock soaring 20%, but as usual, the euphoria

quickly wore off, and today its shares trade 22% below that high point. Ever the optimists, Sears investors grasp onto any hint of good news, only to be smacked upside the head by reality.

From spinoffs and sales of stores to financing and branding deals, Sears stock rallies on the news only for the hoped-for long-term gains to be revealed as ephemeral. No one wants to see Sears go under, and its investors likely hope each fresh development will be the one that marks the start of the retailer's revival, but that never turns out to be the case.

### Operating on a non-recurring basis

There was good reason not to get too excited by Sears' first quarter. A quick read of the press release showed that its $244 million Q1 profit had nothing to do with its shoppers buying more clothes or household goods, since comparable-store sales tumbled 12.4% at Sears and 11.2% at Kmart. Rather, it was deals like the sale of its Craftsman tool business to Stanley Black & Decker (NYSE:SWK) that inflated its returns. If you backed them out, Sears actually had a loss of $230 million, worse than the $199 million loss it recorded a year before.

And so it has ever been with Sears since Chairman and CEO Eddie Lampert bolted together the ailing Kmart and Sears, Roebuck chains. Early on, it was the use of financial gimmicks such as total return swaps and stock buybacks that allowed Sears to keep up the appearance of improvement; later, it was spinoffs like those of Sears Hometown & Outlet Stores and Land's End.

Most recently, it has been the monetization of Sears' significant real estate holdings that has driven the gains, such as those realized after Lampert created the real estate investment trust Seritage Growth Properties (NYSE:SRG) and sold it several hundred stores, or dipping into his admittedly deep pockets to loan the retailer money. Unfortunately, all that has simply allowed Sears to keep the lights on.

### Burning the furniture to heat the house

Analysts estimate Sears Holdings is burning through so much cash that it could run out within the next month. TheStreet.com quotes Iszo Capital financial analyst Brian Sheehy as saying Sears is burning through $189 million a month in cash, and because at the end of April it had just $70 million left on its credit revolver and $264 million in cash, the well should run dry in July. Unless, of course, it can come up with yet another one-time cash infusion.

The problem is that Sears is running out of gimmicks to deploy and assets to shed; it can't keep this up for much longer. But some speculate that a month longer is all the time Lampert really needs before he can allow Sears to go under.

According to Debtwire, a corporate debt intelligence service, because of Sears property sale to Seritage in 2015, July 8 would be the earliest the retailer could seek bankruptcy protection without worrying about being accused of violating laws on fraudulent conveyance. Under bankruptcy law, there is a two-year window where the courts can consider whether assets were improperly transferred.

**The end is nigh**

That was also one of the concerns surrounding the sale of Craftsman that Stanley acknowledged was a possibility. Although the toolmaker said it had shielded itself from Sears financial woes, it admitted a judge could unwind the deal if a judge determined Sears was bankrupt at the time of the deal or became bankrupt because of it.

Of course, Sears is not profitable, it has declared there is an imminent risk of bankruptcy (albeit the disclosure was largely boilerplate), and it has within the past week said it will be closing even more stores than it had previously announced and slashing dozens of corporate positions.

While Sears Holdings investors may be hoping for the best, at this point they should realize that whatever good news is delivered, bad news will probably be following close behind. ***The retailer has been described as a slow motion liquidation, and we may very well see the end of it next month.***

87. On June 21, 2017, *Dow Jones Institutional News* reported in an article entitled

"Fraudulent Conveyance Rules May Pave Way for Sears Bankruptcy in July -- Barron's Blog" the

following:

It's no secret that Sears Holdings (SHLD) is considered at risk of bankruptcy.

Moody's gives it a Caa2 rating, seeing substantial risks. Fitch Ratings wrote just last week:

While retail remains the sector to watch, the default rate is highly dependent on defaults from two large issuers: Claire's

42

> Stores and Sears. Fitch forecasts a 9% retail default rate by year-end, including defaults from both.
>
> But one factor that may affect the timing is lesser known.
>
> Laurel Durkay, a real estate portfolio manager at Cohen & Steers, pointed out on Wednesday that rules around "fraudulent conveyance" will no longer be a concern in July because it will have been two years since Sears transferred properties to Seritage Growth Properties (SRG), a real-estate investment trust.
>
> If Sears had filed for bankruptcy within two-years, "fraudulent conveyance" could have been alleged, ***something CEO Eddie Lampert would have wanted to avoid.***
>
> "It's all coming to a head now," said Durkay.
>
> On Wednesday, The Wall Street Journal reports that Sears Canada is preparing to file for bankruptcy protection there, according to sources.
>
> Sears stock fell more than 5% Wednesday and closed at $6.43.

88.     On June 26, 2017, *The Motley Fool* reported in an article entitled "Dead Stock Walking: Sears Holdings Has Nowhere to Go but Down; This zombie retailer thinks it's clinging to life, but it's dead and just doesn't know it" the following:

> There are multiple reasons that Sears has yet to succumb. First, Lampert and his friends have deep pockets. Time and again he's come up with financing plans to keep the lights burning, only to have to go back to the well a short time later; at the rate Sears is burning cash, that's going to get old soon.
>
> Second, Sears hasn't been completely stripped of value. While some brands like Lands' End and Craftsman tools have been spun off or sold, it still owns Kenmore and DieHard, and has a portfolio chock-full of supposedly valuable real estate.
>
> Third, there's speculation Lampert is doing some clock-watching. Apparently, there's a two-year look-back period following a transaction that bankruptcy courts can use to determine whether a company was bankrupt at the time of conveyance, or became so as a result of the deal, in which case they can unwind the transaction. Lampert sold hundreds of stores to the real estate investment trust Seritage Growth Properties (NYSE:SRG) in 2015; that window closes on July 8, and some analysts suspect he's been keeping Sears

limping along to make it over that finish line, as he has just enough cash on hand to make it.

\* \* \*

In short, there's little left of value to strip from Sears Holdings, and time is running out before Lampert will have to work some more hedge-fund magic to raise more cash. Sooner or later Sears will succumb. As of right now, it's just a dead stock walking.

89.     As of June 27, 2017, two thirds of the shares of Sears Stock were sold short, indicating most investors were betting its price would fall. As *The Motley Fool* reported, Sears "is losing hundreds of millions of dollars a quarter, and comparable sales are plunging. Bankruptcy looks inevitable."

90.     On June 27, 2017, *RetailDIVE* reported in an article entitled "What's the endgame for Sears? The news from Sears is grim. Is there a light at the end of the tunnel — or is this just the slowest liquidation sale in history?" the following:

Few people outside the remaining executive ranks of Sears Holdings are projecting optimism about the company these days.

\* \* \*

**Death by 1000 cuts**

So far for the year, Sears plans to close 270 stores — well more than twice what fellow department store retailer Macy's said it would close in its own downsizing moves. Sears' closures grew in June when plans for more than 60 additional store closings, including 49 Kmart stores, became public. An announcement of 20 additional store closures soon followed. All told, Sears has cut its store footprint nearly in half since 2012 — from 2,019 stores to fewer than 1,200 once all planned closures are completed this year.

The company has also shed more than 500 corporate jobs thus far in 2017 in an effort to further reduce costs. Greg Portell, lead partner in consulting firm A.T. Kearney's retail practice, said Sears' most recent staff cuts are not worrisome as long as they are part of an orchestrated strategy — or, in his words, "a known path" — rather than a reaction to an unexpected event.

44

Departing with the most recent wave of laid-off workers will be three key executives: Stephan Zoll, president of online; David Pastrana, president of apparel; and Eric Jaffe, senior vice president of Shop Your Way. The context of those executive departures is not exactly clear. A Sears spokesperson said the roles and responsibilities would be filled through a mix of job consolidation and internal hires, though the company is still "working through that."

The departure of those three executives is notable for what they oversaw. Apparel represents about a quarter of Sears total merchandise sales, while online sales and the loyalty program Shop Your Way are key aspects of Sears' current strategy as a retailer. The loyalty program, which was headed by Jaffe, who had been an ESL analyst before joining Sears, has been a key piece of the company's turnaround efforts. In a February press release, the company said it planned to make investments in further developing Shop Your Way, which has regularly added partnerships and capabilities in recent years.

"It's kind of odd the people who are leading your strategy are part of the group that's out," Mark Cohen, a former Sears executive and Columbia University retail studies professor, told Retail Dive in an interview. "***But what is it about Sears' performance over the last 12 years that suggests there's anything to talk about in terms of a future?***"

**'There really isn't a way forward'**

"It's been a long, slow trainwreck at Sears," Ken Perkins, president of retail research firm Retail Metrics, told Retail Dive.

On the one hand, asset sales, corporate cost cuts and cash infusions from Lampert and his hedge fund have all helped stave off bankruptcy, according to Perkins. But "the cupboard is becoming increasingly bare" in terms of assets left for Sears to sell off.

More importantly, Sears is struggling to give shoppers a reason to walk through its doors. According to data from Perkins' firm, ***Sears' sales growth has lagged behind that of the struggling department store sector as a whole during nearly every quarter since 2008. During that same time, Sears has experienced just one quarter of positive sales growth — all the way back in 2010.***

"Given how competitive the entire retail landscape is, where you have a company like Macy's, which is much better positioned just in terms of national brand, product offerings, cleanliness of stores,

investments in IT and ecommerce efforts — *all things Sears hasn't done* — and even they are having a tough go of it and shuttering 100 stores. There's really just no light at the end of the tunnel [for Sears]. It's only a matter of time before the lights go out," Perkins said. "There really isn't a way forward. … I don't see how it can possibly survive long-term."

\* \* \*

For starters, bankruptcy is still a very real possibility. Fitch's Silverman said his firm still sees risk that Sears could default in the next year or two despite several restructuring moves this year. *"The company continues to need $2 billion in liquidity every year to fund EBIDTA losses, capex, basic maintenance, pension payments, debt payments and other fixed obligations,"* he said. "While some of the moves they have made this year should be able to help the company operate in 2017, in our analysis, they have not changed the company's long-term picture."

91.     On July 7, 2017, Sears announced it would close another 43 stores.  As *Fortune.com*

reported:

It's questionable that an additional 43 stores and experimenting with new store formats will be enough to move the needle for a retailer with 1,000 locations. Indeed, Sears has closed hundreds of weak stores in the last few years, yet *comparable sales - a metric that strips out the impact of newly closed or open stores- have continued to relentlessly fall.*

**Defendants Failed to Properly Investigate the Continued Prudence of Sears Stock and/or Employ a Reasoned Decision-Making Process in Evaluating Company Stock**

92.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a

plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  *See* discussion *supra*

in Nature of the Action, ¶ 8.

93.     When enforcing the duties of prudence and loyalty, courts focus not only on the

merits of the transaction, but also on the thoroughness of the investigation into the merits of the

transaction.  A pure heart and an empty head are not defenses to breaches of ERISA's fiduciary

duties.  With respect to Sears Stock, as alleged herein, Defendants failed to engage in a reasoned

46

decision-making process, consistent with that of a prudent man acting in a like capacity, to review and properly evaluate Company Stock.

94.     At this stage of the case, prior to engaging in discovery, Plaintiff believes Defendants – in particular, the Committee – failed to appropriately evaluate the prudence of the Plan's continued investment in Sears Stock at least early in the Class Period.[16] Early in the Class Period, Defendants likely erroneously believed they were entitled to a presumption of prudence and could continue offering the Fund if Sears was not on the brink of collapse.

95.     The Committee's failure to adequately investigate the prudence of Company Stock during the Class Period was a circumstance rendering any reliance on Sears Stock's price improper because by their inaction, the Committee showed they were not even evaluating the Company Stock on any basis – let alone, based on its price.  Defendants' inaction in the face of crisis does not satisfy their duty of prudence.

---

[16] As the Eighth Circuit has found:

> [w]e must be cognizant of the practical context of ERISA litigation. No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.  Thus, while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information.  If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer.  These considerations counsel careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief[.]

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (Citation omitted).

## THE RELEVANT LAW:  CLAIMS FOR RELIEF UNDER ERISA

96.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."   ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity other than a named fiduciary that in fact performs fiduciary functions for a plan is also considered a fiduciary of that plan.  A person or entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

97.     At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

98.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

99.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

100.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

48

of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

101.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B)—referred to as the duties of loyalty, candor, exclusive purpose and prudence—are the highest known to the law, and entail, among other things:

a.   the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.   the duty to avoid conflicts of interest and to resolve them promptly if they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.   the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

102.   Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any purported plan direction to maintain investments in such stock and protect the plan by investing the plan assets in suitable, prudent investments.

103.   ERISA § 405(a), 29 U.S.C. § 1105 (a), provides, in pertinent part:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he

49

participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

104. Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of Defendants' breaches of fiduciary duties by for violations of ERISA § 404(a)(1) and § 405(a).

## Count I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404(a)(1)(B) and 405 by the
### Company, Plan Administrator and Committee Defendants)

105. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106. This Count alleges fiduciary breaches against the Company, Plan Administrator and Committee Defendants (the "Prudence Defendants") for failing to adequately monitor the prudence of investment in Sears Stock for Plan beneficiaries and continuing to allow the investment of the Plan's assets in Sears Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement savings vehicle. At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

107. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all

50

investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Prudence Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent. The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

108.    A fiduciary's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

109.    The Prudence Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Participants from the inevitable losses that they knew would ensue as the already-weakened Sears faced quarter after quarter of loss as its business model became increasingly difficult and its ultimate demise became more likely. The Prudence Defendants, in particular the Committee Defendants, waited until years after it was clear Sears had no viable path to profitability to take action. At that time, they froze the Fund rather than liquidating it, an action they should have taken years earlier.

110. The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Company Stock during the Class Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

111. The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

112. As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Participants, lost a significant portion of their retirement investments. Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan and themselves.

113. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses (including lost profits) to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## Count II

### Breach Of Duty of Loyalty
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404(a)(1)(A) and 405 by All Defendants)

114. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

115. This Count alleges fiduciary breaches against all Defendants (the "Loyalty Defendants") for continuing to allow the investment of the Plan's assets in Sears Stock throughout

the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle.

116.     At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

117.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

118.     The duty of loyalty includes the duty to speak truthfully to a plan and its participants when communicating with them.  An ERISA fiduciary's duty of loyalty includes an obligation to provide a plan's participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under a plan.

119.     During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:   failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Sears Stock; and by otherwise placing their own and/or the Company's interests above the interests of the Participants with respect to the Plan's investment in the Fund.

120.     Further, the Loyalty Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-

recognized in the 401(k) literature and the trade press concerning employees' natural bias toward investing in company stock, including that:

        a.      Out of loyalty, employees tend to invest in company stock;

        b.      Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

        c.      Employees tend not to change their investment option allocations in the plan once made; and

        d.      Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

121.    During the Class Period, the Loyalty Defendants, upon information and belief, fostered a positive attitude toward Company Stock, and/or allowing Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock. As such, Participants could not and did not appreciate the true risks presented by investments in Sears Stock and therefore could not make informed decisions regarding their investments in the Plan. Knowing of employees' natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Participants. Defendants, however, disregarded their duties of loyalty to the benefit of the Company.

122.    Further, Defendant Lampert and his hedge fund and Fairholme Capital, which owned nearly three quarters of Sears Stock at times during the Class Period, had an interest in keeping the Plan invested in Sears Stock and in Sears not declaring bankruptcy. According to Sears's proxy statement of April 1, 2016,[17] Defendant Lampert and Fairholme Capital

---

[17] *See* www.sec.gov/Archives/edgar/data/1310067/000119312516526713/d265406ddef14a.htm.

Management, LLC, collectively owned 79.6% of Sears Stock. The Plan owned approximately 1.5% of Sears Stock, which was approximately 7.4% of the Sears Stock not owned by Defendant Lampert and Fairholme Capital Management, LLC, and thus represented a considerable amount of the outstanding Sears Stock.

123. The Committee Defendants were compensated by Sears Holdings Management Corporation and served at the whim of Defendant Lampert. ¶¶ 29, 37.

124. The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

125. As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated. If the Loyalty Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investments and thus were damaged.

126. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## Count III

### Failure to Adequately Monitor Other Fiduciaries and Provide
### Them with Complete and Accurate Information
### (Breaches Of Fiduciary Duties In Violation Of ERISA § 404 by the Monitoring Defendants)

127.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

129.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

130.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when monitored fiduciaries are not performing their fiduciary obligations.

131.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

132.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

133.     During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

a.     failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

b.     failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

c.     to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

d.     failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the circumstances and conditions that rendered it an imprudent investment during the Class Period.

134.     As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

135.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those of the monitored fiduciaries, and enabled the breaches by those Defendants, and failed to make any effort to remedy those breaches despite having knowledge of them.

136.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Participants, lost tens of millions of dollars of retirement savings.

137.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## **Causation**

138.    The Sears Stock price collapse of over 80% during the Class Period, which devastated the Plan's assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties.  Defendants could have taken certain actions based on the publicly known information alone such as, and not limited to:  investigating whether Sears Stock was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the DOL or SEC); resigning as fiduciaries of the Plan; stopping or limiting additional purchases of Sears Stock by the Plan; utilizing the Fund's unitization such that it was only primarily invested in Sears Stock; and/or by divesting the Sears Stock held by the Plan.

139.    Despite these and other options, Defendants—who knew or should have known that Sears Stock was an imprudent retirement investment—chose to, as fiduciaries, continue allowing the Plan to acquire further Sears Stock, while taking no action to protect their wards as Sears's condition worsened and the Plan Participants' retirement savings were decimated.    Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its Participants.    Instead, Defendants waited until Sears Stock had predictably lost over 80% of its value, and even then only took a part of the action they should have taken.

140.    To the extent Defendants wanted to take action based on non-publicly disclosed information that they were privy to, the following alternative options—which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent—were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

141.    First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock Fund be held in cash rather than be used to purchase Sears Stock.    The refusal to purchase Company Stock for the Company Stock Fund is not a "transaction" within the meaning of insider trading prohibitions.    This action would not have required any independent disclosures that could have had a materially adverse effect on Sears Stock's price.

142.    Alternatively, Defendants should have closed the Fund itself to further contributions and directed that contributions be diverted from the Fund into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

143.    A further alternative available to Defendants was to utilize the Fund's unitization so that Participants were less exposed to Sears Stock.

144.    Additionally, and importantly, because Defendants could and should have concluded that Sears Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plan's holdings.

145.    The Plan suffered tens of millions of dollars in losses during the Class Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Participants.

146.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and the Participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company Stock.

147.    Given the totality of circumstances prevailing during the Class Period no prudent fiduciary would have made the same decision to retain the clearly imprudent Sears Stock as an investment in the Plan.

148.    Despite the availability of these and other options, Defendants took no meaningful action during the Class Period to protect Participants from losses as a result of the Company Stock's imprudence until it was too late to make any substantial difference.

**<u>Remedies For Breaches Of Fiduciary Duty</u>**

149.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

150.    ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any

person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

151. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

152. Plaintiff, the Plan, and the Participants are, therefore, entitled to relief from Defendants in the form of: (1) a payment to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

153. Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## **Jury Demand**

154. Plaintiff demands a trial by jury.

**Prayer for Relief**

WHEREFORE, Plaintiff demands the following relief:

A.      A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan and the Participants during the Class Period;

B.      A Judgment against each Defendant, jointly and severally, compelling them to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Plan would have made if the Defendants had fulfilled their fiduciary obligations;

C.      A Judgment imposing a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      A Judgment against each Defendant, jointly and severally, for the actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

E.      A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in the common stock of Sears maintained by the Plan in proportion to the accounts' losses attributable to the decline in Sears Stock's price;

F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  July 14, 2017                          Respectfully submitted,

                                               By: /s/ Bruce C. Howard
                                               Bruce C. Howard
                                               bhoward@siprut.com
                                               Richard S. Wilson
                                               rwilson@siprut.com
                                               SIPRUT PC
                                               17 N. State Street
                                               Suite 1600
                                               Chicago, Illinois 60602
                                               Telephone:  (312) 236-0000
                                               Telephone:  (312) 878-1342

                                               Michael J. Klein
                                               mklein@ssbny.com
                                               **STULL, STULL & BRODY**
                                               6 East 45th Street
                                               New York, NY 10017
                                               Telephone:  (212) 687-7230
                                               Telephone:  (212) 490-2022

                                               ***Counsel for Plaintiff***